IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA )<br>)<br>v. )<br>)<br>ANDREW MCHANEY )<br>) | No. 18 CR 45-2<br><br>Honorable Elaine E. Bucklo |

**ANDREW MCHANEY'S
SENTENCING MEMORANDUM**

Defendant Andrew McHaney, by and through his undersigned counsel, submits this sentencing memorandum setting forth certain factors to be considered in determining a sentence that is sufficient but not greater than necessary under 18 U.S.C. § 3553(a). For the reasons set forth below, Mr. McHaney seeks a below-guidelines sentence of ten years of incarceration, which would comply with and exalt the directives of 18 U.S.C. § 3553(a).

**I.     LEGAL STANDARDS**

A sentence must be "sufficient, but not greater than necessary" to satisfy the purposes of sentencing. 18 U.S.C. § 3553(a). The statutory sentencing factors found in section 3553(a) provide the Court with the framework upon which to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing by taking into account, among other things, the nature and circumstances of the offense, the history and characteristics of the defendant, and the need for the sentence imposed to satisfy the purposes of sentencing. *Id*. Courts are required "to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate,

1

sometimes magnify, the crime and the punishment to ensue.'" *Pepper v. United States*, 131 S. Ct. 1229, 1240 (2011) (internal quotations omitted).

## II. PSR & GUIDELINES

There are two minor factual corrections as to the PSR. First, as to paragraph 147, Mr. McHaney earned his GED in 2007, and the GED classes he also occurred in 2007, not 2010. PSR ¶ 147. Second, as to paragraph 103, there is a typographical error – Mr. McHaney was paroled in 2010, not 2019. PSR, ¶ 103.

As noted in the PSR, this federal case involves some offenses that were initially charged in state court. *See* PSR, ¶ 115, 116. Mr. McHaney seeks credit for time served while he was detained on a related state matter. Mr. McHaney was arrested on May 28, 2017 and had been detained since. PSR, ¶ 5, 116. He was subsequently federally indicted for that and other offenses and was remanded to federal custody on February 7, 2018. PSR, ¶ 8.

As for the Guidelines, Mr. McHaney concurs with the guidelines as calculated in the PSR. Yet, for the many reasons outlined below, pursuant to Section 3553(a), he believes a below-guidelines sentence is sufficient but not greater than necessary.

## III. 3553(a) FACTORS

### A. History and Characteristics

#### 1. *Childhood*

Andrew McHaney was raised in Evanston, Illinois. PSR, ¶ 120. Andrew has been dealing with loss since he was a child. He never knew his father. PSR, ¶

2

118. His mother struggled with addiction. PSR, ¶ 120. His beloved grandmother, Margaret McHaney, took Andrew and his five brothers and sisters into her home. PSR, ¶¶ 119, 120. She "did everything to raise [Andrew] right." Exhibit A (Andrew McHaney Letter), at 1. Andrew's mother visited them regularly and tried to work on her sobriety. PSR, ¶ 120. He was just six years old when his mother passed away from cancer. *Id.*

Today Andrew recognizes that he needed counseling and help processing his grief. Instead, he got lost in the sea of people his grandmother cared for. As he grew, Andrew chaffed under his grandmother's strict guidance. He found a home with basketball, but struggled within traditional confines of church and school. PSR, ¶ 121, 145, 146.

As detailed below, at twelve-years old Andrew starting using alcohol and marijuana. His criminal history began shortly after, at age 15, including a number of burglaries from age 15 to 20. PSR, ¶ 99-104. The offenses here occurred when he was 25, still a relative young age. PSR, ¶¶ 115, 116.

    2.    *Significant Addiction*

Andrew started using substances early, to flee his feelings and situation. *See* PSR, ¶ 137. At 12 he was drinking and using marijuana. At 14, he started taking addictive opioid pain relievers and ecstasy, which used regularly until his arrest in 2017. PSR, ¶ 140. Ecstasy is long-lasting psychoactive drug that is both a stimulant and psychedelic; Andrew took it five times a week for years. PSR, ¶ 139. The volume of his consumption is staggering, and significantly interfered with normal functioning. At the end, Andrew was committing crimes to stay high. PSR, ¶ 143.

3

Since getting sober almost three years ago, Andrew has been able to meaningfully reflect on the cycle he was in. Andrew's drug use caused him tremendous harm and was a point of contention for the loved ones who knew what he was battling. PSR, ¶ 142; Exhibit B (Jessika Sutton Letter), at 1; Exhibit E (Keirsten Cheatham Letter). He previously had some drug counseling, although he wasn't ready to stop using. PSR, ¶ 143. Nevertheless, that framework helps him today. He recognizes that he was using to self-medicate his depression.

Despite these extreme challenges, Andrew had spurts of stability. He worked at the same copy store for two years. PSR, ¶ 154. He worked at Lou Malnati's as a busboy and waiter. PSR, ¶ 152. He stayed connected with his close-knit family and long-term friends, which buoyed him.

   3. *Future & Consequences*

Andrew was arrested in May 2017. Detained at Jerome Combs Detention Center, Andrew enrolled in Thinking for a Change and graduated February 28, 2018. This cognitive-behavioral change program gave him a structure with which to evaluate his choices and thinking patterns. *See* PSR, ¶ 132; Exhibit G (Certificate); Exhibit A, at 2 ("Through thinking for a change I can now identify my problem[s] and face them head on. I understand that everything starts with a thought and that I have to think different."). He suffered the loss of an uncle, followed shortly by the murder of his cousin Joseph McHaney in October 2018. PSR, ¶ 122; Exhibit B. This was a profound loss for Andrew. Joseph and he were raised together like brothers, and were inseparable. Jessika Sutton writes about how Andrew supported her through her loss from jail, calling daily and sending

4

friends to check on her. Exhibit B, at 1. Despite his own shock and pain, Andrew always put her needs first. *Id.* Although Andrew's selflessness is a consistent theme echoed by all his family and friends, this particular example shows tremendous maturity and care while struggling through his own traumatic loss.

The loss of his uncle and Joseph's murder sharpened Andrew's fear of losing loved ones while imprisoned, particularly his grandmother Margaret. She turns 90 years old in March, and the thought of being unable to say goodbye consumes Andrew. He unsuccessfully sought bond primarily for this purpose. *See* Dkt. 203. He lives with the regret of choices every day.

Andrew speaks frankly and openly with his loved ones about his fears and his hopes. This open line of communication is an essential tether for him. His ability to accurately reflect on his actions, accept the consequences, and build for his future bodes tremendously well. He talks to family members and friends about his reentry plan. He is interested in welding, in learning about real estate, and in getting a commercial driver's license. PSR, ¶ 148; Exhibit B, at 2; Exhibit E. Ms. Sutton notes the passion in his voice when he talks about his future. Exhibit B, at 1. He plans to do any and every vocational program that the BOP will offer him. But, he also recognizes he must change himself. He has pinpointed that he needs therapy to address the loss he has endured, anger management, and substance use issues. He is ready and open.

Importantly, Andrew will have the strong support of a community of friends and family who love him. In his world, Andrew is universally seen as someone who always puts others ahead of himself. Exhibit B, at 1; Exhibit C (Olicia Wynter), at 1; Exhibit E. He is described as loving, caring, and giving. His

actions here are discordant with the person his community knows him to be. They pledge their active support to him on the road ahead.

### 4. *Acceptance of Responsibility*

Andrew has demonstrated a sincere, reflective, and ongoing acceptance of responsibility. *See* PSR, ¶¶ 40, 41; Exhibit A. He is engaged in confronting his actions and the consequences thereof. As someone who carries unprocessed trauma, Andrew deeply regrets putting someone else through a traumatic experience. This acceptance isn't cursory or fleeting. He acknowledged responsibility in bond proceedings before Judge Gilbert, in his letter to the Court, in his PSR interview, and in honest communication with his family. *See* Dkt. 203; PSR, ¶ 41. His genuine acceptance of responsibility of the harm he has caused demonstrates his maturity.

### B. **Nature and Circumstance of Offense**

Andrew McHaney summarized the offenses aptly: "No one should have to go through went they went through." Exhibit A, at 1. *See also* PSR, ¶ 41. The Government sets forth the facts of what transpired, which Mr. McHaney does not dispute. He cannot change his past choices. Looking back with the clarity of sobriety and reflection—through the lens of his own loss—Andrew fully sees the harm that he caused. He is "truly sorry for what [he] put them through." *Id.* Thankfully, no one was physically injured and law enforcement intervened.

### C. **Brain Development & Decision Making**

Andrew McHaney stands before this Court as a 28-year old man. He was arrested on the instant offense when he was 25. In addition to Andrew's significant mental health and addiction issues, the relative youth of his brain may

6

have also impacted his decision-making with regard to this offense and as to the spate of burglaries when he was younger. The prefrontal cortex governs judgment, decision-making, and impulse control. Yet, evolving science around brain development teaches us that the prefrontal lobe matures much later than other parts of the brain. *See e.g.* Jay N. Giedd et al., *Anatomic Magnetic Resonance Imaging of the Developing Child and Adolescent Brain and Effects of Genetic Variation*, 20(4) NEUROPSYCHOL REV. 349 (December 2010), at p. 10 (author's manuscript).[1]

In *Gall v. United States*, 552 U.S 38 (2007), the Supreme Court uplifted a previously neglected mitigating factor—a defendant's immaturity at the time of the offense. In upholding a below guideline the sentence, the *Gall* Court emphasized the district court's reliance on the defendant's youth, lack of maturity, and drug use at the time of his offense. In particular, the Court took note of the district court's reliance on medical studies indicating that full brain development, and therefore maturity, may not be reached until age twenty-five.[2] With the interplay of significant drug use, Andrew McHaney's relative brain youth may have played a part in his poor decision-making. Given that Andrew cannot reenter society until he is well into his thirties, this particular risk is ameliorated.

---

[1] https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3268519/pdf/nihms347434.pdf.

[2] *See Gall v. United States*, 552 U.S 38, 58 citing *United States v. Gall*, 374 F.Supp.2d 758, 762 (S.D. Iowa 2005) ("Elizabeth Williamson, *Brain Immaturity Could Explain Teen Crash Rate,* WASH. POST, Feb. 1, 2005 at A01 (summarizing a recent National Institutes of Health longitudinal study showing 'that the region of the brain that inhibits risky behavior is not fully formed until age 25')").

7

### D. Deterrence

Familial (and community) support is an important predictor of an offender's success after incarceration because those relationships substantially reduce his risk of recidivism. Solangel Maldonado, *Recidivism and Parental Engagement*, 40 FAMILY L. Q. 191, 196 (2006). *See also* Mark T. Berg & Beth M. Huebner, *Reentry and the Ties that Bind: An Examination of Social Ties, Employment, and Recidivism*, 28 JUSTICE Q. 382, 384-86, 401-02 (2011). Offenders who maintain strong family networks, like Andrew has, are less likely to recidivate. Andrew has a community of people who support him – family and close friends who see the best in him and stand by him. Andrew earned that love and support over the years he spent caring for others.

Importantly, Andrew has a number of close people in his life that have survived prison themselves, changed their trajectory, and have found long-term stability and growth. His uncle Craig Bates and friend Alton Belcher have walked this same path before. *See* Exhibit D (Craig Bates Letter). Andrew is not alone. He is tethered to loved ones who innately know the struggle he faces; they will help shepherd him though.

Moreover, as the Court well knows, swiftness and surety of sanctions have a greater deterrent effect than severity of punishment.[3] "The research evidence is unequivocal that incarceration does not reduce offender recidivism."[4] At some

---

[3] *E.g.* FAYE S. TAXMAN, ERIC S. SHEPARDSON & JAMES M. BYRNE, TOOLS OF THE TRADE: A GUIDE TO INCORPORATING SCIENCE INTO PRACTICE 62-63 (2004).

[4] ROGER WARREN, NAT'L CTR. FOR STATE COURTS, EVIDENCE-BASED PRACTICE TO REDUCE RECIDIVISM: IMPLICATIONS FOR STATE JUDICIARIES 14 (2007), http://nicic.gov/library/files/ 023358.pdf. *See also* Raymond Pasternoster, *How*

8

point, incarceration can itself prove criminogenic. Here, Mr. McHaney asks for a sentence of ten years, a significant period of time. The presence of both swiftness (arrested at the scene) and surety (full prosecution) limit the need for an even greater sentence. Coupled with his reflection, honesty, and robust acceptance of responsibility, there is sufficient specific deterrence in a decade of incarceration.

### E.     Just Punishment

As discussed above, Andrew has faced significant trauma since he was incarcerated in this matter. The loss of both his uncle and cousin since he has been incarcerated had an immense impact on him. Generally, following the death of a loved one, grief is permanent; however, the most intense manifestations of grief are usually dulled and integrated into one's life through a process of mourning.[5] While grief is difficult for all, some people have a more challenging time. This difficulty is often based on the relationship the bereaved person has with the deceased and the circumstances of the death; untimely and violent deaths are especially difficult to process.[6] Here, Andrew was exceptionally close to his cousin, who was murdered. The process of mourning ordinarily helps us to integrate grief into our lives. But here, Andrew was unable to attend the funeral, hold loved ones, and process his feelings in a safe

---

*Much Do We Really Know About Criminal Deterrence*, 100 J. CRIM. L. & CRIMINOLOGY 765, 817-18 (2010) (discussing and reviewing studies on deterrence); Francis T. Cullen, Cheryl Lero Johnson & Daniel S. Nagin, *Prisons Do Not Reduce Recidivism: The High Cost of Ignoring Science*, 91 THE PRISON J. 48S, 50S-51S (2011).

[5] *See* M. Katherine Shear, *Grief and Mourning Gone Awry: Pathway and Course of Complicated Grief*, 14 DIALOGUES IN CLINICAL NEUROSCIENCE 119 (2012).
[6] *Id.*

9

community. Unresolved grief can cause severe distress,[7] and those around Andrew witnessed how hard he took his cousin's violent death.

Prison is a notoriously isolating and harsh environment. Studies show that incarceration can make mourning especially difficult for myriad reasons.[8] First, accepting a loss is difficult without the chance to say goodbye.[9] Second, the prison environment yields little opportunity to express and process emotion, "with the added complexities of guilt and self-blame common among the prison population."[10] Adjusting to your environment without the deceased is physically impossible where the bereaved doesn't have access to the environment in which their relationship existed.[11] Finally, physical and emotional separation while incarcerated deprives the bereaved of the ability to create new relationships and reinvesting in existing ones.[12] As Andrew experienced, these studies help illuminate the real trauma of significant loss while incarcerated. Today, Andrew lives in fear that he will lose more of his family while he is separated from them. He has—and will—endure significant punishment.

### F. Incapacitation

In truth, at the time of his arrest, Andrew needed intervention. He was rapidly spiraling downward and could not pull himself out. But since his arrest,

---

[7] *Id.*
[8] *See* Nina Vaswani, *The Ripples of Death: Exploring the Bereavement Experiences and Mental Health of Young Men in Custody*, 53 THE HOWARD JOURNAL 341, 343-44 (2014) (citing numerous studies on bereavement in prison).
[9] *Id.* at 343.
[10] *Id.*
[11] *Id.*
[12] *Id.*

10

Andrew turned his thinking around. A sentence centered on incapacitation is not necessary.

### G.     Rehabilitation

Andrew's unprocessed loss led to his abuse of drugs. This in turn led to a cycle of committing crime to earn money to buy drugs to numb himself. Sober now for almost three years, Andrew is trying to break this cycle. The person he has consistently shown to his family and friends has compassion for others. Despite his actions here, Andrew has an enormous heart. He is capable of a complete transformation and has committed himself to it. A Guidelines sentence here is far greater than necessary to achieve retribution and deterrence.

Rehabilitation is also an essential goal of sentencing, and hope is an essential component thereof. There is hope for Andrew McHaney, and an appropriate sentence uplifts the rehabilitative purpose at the heart of our system and values. Therapy, mental health counseling, and drug treatment will do more than prison ever can.

As the Court well knows, there is a tipping point at which severity of sanction fails to achieve its purpose. He seeks a sentence of ten years of imprisonment, a lifetime for Andrew. Yet, it still allows hope for him to continue forward on the road he has plotted for himself. "I know that i'm nowhere near the man I was that walked into jail two years ago. I also know i'm now here near the man I want to become." Exhibit A, at 5.

## IV. CONCLUSION

Taking into account the totality of Andrew McHaney's history and characteristics, his sincere reflection and acceptance of responsibility, his rehabilitation and commitment to change, Mr. McHaney respectfully asks the Court to impose a below-guideline sentence of ten years of imprisonment and to credit him for the time he spent in custody on a related state case. Such a sentence is sufficient, but not greater than necessary, to achieve the goals of sentencing and justice.

Dated: February 4, 2020

Respectfully submitted,

s/ Molly Armour
MOLLY ARMOUR
Attorney for Andrew McHaney

Law Office of Molly Armour
4050 N. Lincoln Avenue
Chicago, IL 60618
(773) 746-4849
armourdefender@gmail.com